The **STATE OF ISRAEL, a Sovereign Nation, Plaintiff-Appellant-Cross Appellee,**

v.

**METROPOLITAN DADE COUNTY, FLORIDA, Defendant-Appellee-Cross Appellant.**

**No. 28771.**

United States Court of Appeals, Fifth Circuit.

Aug. 21, 1970.

---

Richard F. Ralph, Miami, Fla., for appellant; Ralph & Boyd, Miami, Fla., of counsel.

Thomas C. Britton, County Atty., Joan Elizabeth Odell, H. Jackson Dorney, Asst. County Attys., Miami, Fla., for appellee.

Before JOHN R. BROWN, Chief Judge, and GEWIN and THORNBERRY, Circuit Judges.

JOHN R. BROWN, Chief Judge:

The good ship M/V Nili, unsuccessful in the hopes of her owner, operator and perhaps preferred-ship-mortgagee angel, the State of Israel, to tap the rich tourist trade as a cruise ship in and out of the Port of Miami continues to be occupied in litigation there, this time in the form of a sovereign pursuer, not an unwilling or reluctant pursued.[1] In this case the vessel (and owner) was half right, half wrong, a result which we hold was all right.

What is at issue here is the amount of dockage due under the Port Authorities' Tariff. We affirm.

Specifically the issue is whether, for all or part of the period in question, M/V Nili was entitled to a dead storage rate as a vessel "berthed * * * for purposes other than loading and or discharging cargo" or whether the full rate for dockage under the Tariff should apply[2] under a tariff which imposes a dockage charge for berthing at a Port Authority wharf.[3] Although probably superfluous the tariff contained a contractual consent clause[4] and, more sig-

---

1. See our earlier opinion in Stern, Hays & Lang, Inc., v. M/V Nili, 5 Cir., 1969, 407 F.2d 549, 1969 A.M.C. 13. This presented creditor problems from the assertion of maritime liens. She is also the subject of the pending appeal, No. 27126, State of Israel v. M/V Nili, et al.

2. Both rates are specified in Item 445:

| Item | | |
|---|---|---|
| 445 | Dockage Charge | Dockage charge shall be assessed, per registered gross ton, as follows: |
| | | Per day, or fraction thereof ...................... 3¢ |
| | Dead Storage | Vessels berthed at Port of Miami facilities for purposes other than loading and/or discharging cargo, shall be assessed a dead storage charge per registered ton as follows: |
| | | Dead Storage per day, or fraction thereof ........1½¢ |

3. The general provisions are:

SECTION FOUR             DOCKAGE

| Item | | |
|---|---|---|
| 425 | Definition | Dockage is the charge assessed against a vessel or other watercraft for berthing at a wharf or bulkhead structure or for mooring to a vessel or other watercraft so berthed. |
| 430 | Basis of Charge | Dockage shall be assessed on the gross registered tonnage of the vessel as shown in Lloyd's Register of Shipping. The County reserves the right to admeasure any vessel when deemed necessary and use such measurements as the basis of the charge. |
| 435 | Dockage Begins | Dockage begins when a vessel makes fast to a wharf, pier, or bulkhead structure, or to another vessel which has made fast thereto, and each 24-hour thereafter, or part thereof constitutes one day's dockage. |
| 440 | Shifting from one Wharf to Another | Dockage shall be charged on the basis of straight running time, while at any wharf, or bulkhead structure. Shifting from one wharf, pier, or bulkhead structure when both are operated by the County will not interrupt the straight running time. |

4.

| Item | | |
|---|---|---|
| 220 | Consent to Terms of Tariff | The use of the waterways and facilities under the jurisdiction of the County shall constitute a consent to the terms and conditions of this tariff, and evidence an agreement on the part of vessels, their owners and agents, and other users of such waterways and facilities, to pay all charges specified in this tariff, and be governed by all rules and regulations herein contained. |

nificantly, did require "application * * * in writing * * *" for a berth "specifying the nature and quantity of cargo, if any to be handled."[5]

The District Court, in a judge trial befitting the maritime character of the claim, held that for the period up to the time of written notice and demand for dead ship half dockage, the vessel owed full dockage but that subsequent to the notice-demand only half dockage was due. All are aggrieved and all appeal.

The facts, neither complex nor conflicting, may be severely capsulated. In connection with the perils, not of seas, but of litigation (see M/V Nili, note 1, *supra*), the vessel was attached on November 18, 1966 at the instance of the State of Israel to foreclose its preferred ship mortgage. The attachment ceased on February 7, 1967 at which time the State of Israel took title to M/V Nili. Dockage during this whole period was at the full .03¢ rate. After February 7, 1967, with ownership now in the State of Israel, responsibility for dockage charges became the added burden of the Sovereign. Dockage was billed at the full .03¢ rate from February 7, 1967 to April 30, 1967.

Oddly enough, the tariff provision for dead ship half rate (note 2, *supra*) was unknown to the State of Israel or her counsel, a knowledgeable former proctor. Without knowledge of it, Shipowner on April 21, 1967 directed a formal letter to the Port Director requesting him to give "consideration to a reduction [of dockage] * * * effective May 1, 1967."

As with taxes, we start with the proposition that morality, equity or the invidious reflex of each has no part in tariff application. A tariff required by the appropriate regulatory statute,[6] like the law of the Medes and Persians which altereth not is more than a consensual contract. It has the force of law with the analogous dignity of a statute. Compania Anonima Venezolana De Navegacion v. A. J. Perez Export Co., 5 Cir., 1962, 303 F.2d 692, 696 and see especially n. 12, 1962 A.M.C. 1710, cert. denied, 1962, 371 U.S. 942, 83 S.Ct. 321, 9 L.Ed.2d 276. The only tolerance is in tariff construction, a task which here is free of tariffese which often plagues such problems, sending judges searching for a way to put the burden on a supposedly expert body. See Louisville & Nashville Railroad Co. v. Knox Homes Corporation, 5 Cir., 1965, 343 F.2d 887, and cases cited therein, United States v. Western Pacific Railroad Co., 1956, 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126; Far East Conference v. United States, 1952, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576.

When it comes to construction of this tariff it does not seem to us to matter too much whether the full rate is considered to be the normal one from

---

**5.**

*Item*

| 215 | Application for Berth & Extra Charge | All vessels desiring a berth at the Port of Miami, shall, as far in advance of the date of docking as possible, make application to the Director for a berth in writing, specifying the date and estimated time of arrival, sailing, and the nature and quantity of cargo, if any, to be handled. |

Any vessel being berthed or shifted without the approval of the Seaport Department shall be subject to an assessment in the amount equal to twice the published dockage fee and in addition, such vessels may be moved without notice at the owners expense.

---

**6.** There can be no question that, under 46 C.F.R. §§ 533.2, et seq. (1970), the Port Authority was subject to the necessity of filing tariffs under the United States Acts. See State of California v. United States, 1944, 320 U.S. 577, 64 S.Ct. 352, 88 L.Ed. 322.

which an applicant must demonstrate a right of deviation, so that the dead rate is treated as an exception, or whether each stands on its own. In either event, if the ship is at the berth for "purposes other than loading and/or discharging cargo" [7] she is entitled to the half rate.

The only real problem is whether this is self-executing in the sense that, without any formal notice of any kind to the Port Authority, the applicable rate fluctuates from time to time as the "purpose" is or is not for loading or discharging of cargo-passengers. On this feature we agree with the trial Judge that Item 215 "application for berth & extra charge" (see note 5, *supra*), which requires that a vessel desiring a berth shall "make application * * * in writing * * *, specifying the date * * * and the nature and quantity of cargo, if any, to be handled" reads into the tariff charge section some character of notice. This is also a recognition of the practicalities of the situation. In a port affording berths for vessels engaged in the passenger-cargo trade, it is both reasonable to assume that the vessel's stay will be for the usual purpose of loading or discharging cargo-passengers and if not so, that a notice will be given. If the vessel has a different purpose, no one knows it better than the Master, owner or operator, who are in a position to give a specific notice. Indeed, to read it in any other way shifts an unreasonable burden upon the Port Authority. Except that its representatives might visually observe that a vessel was idle such outsiders have no way of knowing what the real plan for the vessel's operation is. More than that, during a typical stay in port a vessel may well change from an apparently idle situation to one of great

activity and all variations in between. These would include, for example, shutdowns during traditional port holidays, non-weather working days, stoppages from interruptions in the flow of cargo and the like. And yet if the vessel came to the berth for the purpose of loading/discharging cargo/passengers, or both, few, if any, of these "objective" signs of idleness would interrupt liability for the full charges or for that matter even allow half rate with notice. The fact is that the Port Authority has no practicable way of knowing Shipowner's purpose. It is entitled to notice.

When it comes to this, Shipowner falls way short of having proved, as it claims, that the Port Director was aware that M/V Nili was at the berth for purposes other than cargo loading or unloading. True, the Judge did find—which no one questions—that the Director knew that the vessel was not actually loading or discharging passengers or cargo. But he also found that the Director knew that the Shipowner was actively attempting to charter or sell the vessel and that the vessel was at all times capable of carrying on usual operations including the loading and discharging of passengers and cargo, if the owner saw fit.

On this reading of the tariff, the whole thing changed when, on April 21, 1967 the formal letter was written to the Director requesting a lower rate which, on the discovery by all of the existence of the tariff provisions, made the dead ship half rate applicable. Consequently, the Judge was right when he held that each one won half way: full rate down to April 21, 1967, the half rate thereafter.[8]

Affirmed.

7. We agree with Shipowner that the term "cargo" would encompass embarking or disembarking passengers of a cruise ship.

8. We believe that differences on arithmetic have been resolved. We make no effort to fix the sums respectively due and leave this to these responsible advocates or, failing in that, to the District Judge on the waterfront.