SOMMER CORPORATION, Plaintiff-
Appellee Cross-Appellant,

v.

PANAMA CANAL COMPANY, Defend-
ant-Appellant, Cross-Appellee.

No. 71–3379.

United States Court of Appeals,
Fifth Circuit.

March 5, 1973.

Dwight A. McKabney, John A. Cooper, John L. Haines, Jr., Earl R. McMillin, Office of the Gen. Counsel, Balboa Heights, Canal Zone, for appellant.

Henry L. Newell, Balboa, Canal Zone, for appellee.

Before JOHN R. BROWN, Chief Judge, and GODBOLD and SIMPSON, Circuit Judges.

JOHN R. BROWN, Chief Judge:

What this case presents is whether the failure of a nominal shipper to pay an additional $6.88 for Trans-Isthmian handling charges on equipment directly destined to a Panama Canal Company construction contract limits Canal Company's liability for cargo damage to less than the full stipulated loss of $9,610.85. For reasons peculiar to the relationship involved we answer in the negative and affirm with modification.

Sommer Corporation brought an admiralty action *in personam* against the Panama Canal Company for cargo damage arising during the shipment of three packages of transformer radiator cooling fins to a Canal Zone construction project. Canal Company appeals from the District Court's $9,610.85 judgment in favor of Sommer, 329 F.Supp. 1187, invoking the $500 per package liability limitation prescribed for cargo handling [1] under Canal Company's published tariff.[2] Sommer cross appeals from the denial of prejudgment interest. We modify and affirm.

On June 30, 1967, Sommer contracted with Canal Company for the installation of a power transformer at the Miraflores Locks substation in the Canal Zone. In accordance with the contract specifications Sommer provided a detailed breakdown of all materials and equipment to be furnished for the project, including descriptive brochures and

---

1. Part One of the tariff's Marine and Longshore Services, § 160 "cargo services" defined "handling" as follows:
   "(4) Handling: (a) The moving of cargo from the cleared slings of delivering vessels to cars, freight house, or storage or (b) the delivery of cargo from cars, freight house, or storage to within reach of the tackle of receiving vessels."
   § 160.01(4).

2. § 160.02 of Part One (bracketed [i], [ii], etc. inserted for ease of reference) prescribed:

   "(3) The Panama Canal Company shall in no case be [i] liable for loss or damage to commodities received on the piers in excess of $500 per package * * * [i] unless a higher valuation is declared and [iii] the higher rates for the handling or transferring of valuable goods are paid to the Panama Canal Company by the terms of this Tariff [iv] provided that this paragraph shall not apply to commodities received for local rail transportation only."

literature, and there is no dispute that the Construction Division of Canal Company was aware of the approximate actual value ($11,500) of the transformer radiators as a result of the cost estimates prepared under its standard bid procedures.

The contract itself incorporated by reference the provisions of a booklet entitled "General Conditions for Panama Canal Company and Canal Zone Government Construction Contracts (July 1966)," which included an explanation of an optional procedure by which a contractor could secure free ocean freight and rail service for the shipment of construction materials.[3] Since commercial freight service would have increased contractors' costs by approximately 15%, which would have to be passed on to Canal Company by an increased bid, Sommer elected to utilize this procedure and arranged through its New Orleans freight forwarder for delivery of the transformer radiators from the General Electric plant at Rome, Georgia, to Canal Company's New Orleans pier. There the shipment was through billed to Balboa (see GC–13(f)(2) note 3, *supra*) under Canal Company's standard Short Form Bill of Lading naming Sommer as consignee.[4] This meant that the goods

---

3. The relevant provisions of the "General Conditions" are as follows:

"GC–13 SERVICES AND SUPPLIES PURCHASABLE FROM THE COMPANY AND CANAL ZONE GOVERNMENT:

(a) The contractor and subcontractors may secure services or supplies, when available, from the Company and Canal Zone Government subject to applicable regulations. Current tariff or supplements thereto containing schedules of rates for services will apply to the contractor and his subcontractors. Charges will be those in effect at time the purchase is made or service is rendered. A copy of the tariff may be examined in the office of the Chief, Administrative Services Division, Balboa Heights, Canal Zone or in the office of the Chief, Procurement Division, Panama Canal Company, c/o Naval Support Activity, 4400 Dauphine Street, New Orleans, Louisiana 70140. Inquiries as to tariff rates for particular services, including hire of equipment, may be addressed to either of the above named offices. All rates are subject to change without notice.

*    *    *    *    *

(e) *Wharf and Railway Services:* The Panama Railroad, owned and operated by the Company, runs between the Atlantic Ocean terminal wharves at Cristobal and the Pacific Ocean terminal wharves at Balboa. Charges to the contractor for cargo handling at terminals and for railroad freight services will be in accordance with the current tariffs, copies of which may be obtained as stated in paragraph (a) above.

(f) *Use of Company Transportation Facilities:*

(1) The ocean freight from New Orleans to Cristobal, C. Z., for all articles, materials and supplies which are to be incorporated in the work under this contract  *  *  *  will be for the account of the Company (at no expense to the contractor) when such articles, materials and supplies are shipped via Company vessel out of the port of New Orleans, Louisiana (c/o Naval Support Activity, 4400 Dauphine Street, New Orleans, Louisiana 70140). Ocean freight includes loading on ship from pier at New Orleans and unloading from ship to pier at Cristobal, C. Z. Ocean freight does not include the Isthmian handling charge which will be for the account of the contractor, at the rates stated in the official PCC tariff schedule.

*    *    *    *    *

(2) Shipments thru-billed New Orleans to Balboa or line points will be carried by the Panama Railroad from Cristobal at the expense of the Company. Arrangements for thru carriage of the shipments may be made at the time of loading in New Orleans or prior to unloading at Cristobal."

4. The reverse side of the short-blading incorporated by reference both the Carriage of Goods by Sea Act (COGSA), 46 U.S.C.A. § 1300 *et seq.*, and Canal Company's regular Long Form Bill of Lading, which provides:

"18. In case of any loss or damage to or in connection with goods exceeding in actual value $500. lawful money of the United States, per package, or, in case of goods not shipped in packages, per customary freight unit, the value of the goods shall be deemed to be $500 per package or per unit, on which

would have to be discharged at Cristobal, loaded onto Canal Company cars for rail transshipment to Balboa, C.Z. The goods arrived safely at Cristobal, but at some undetermined point in time between discharge on the dock and loading aboard Canal Company's freight cars three of the nine packages in the consignment were crushed, resulting in the damage here in dispute.

■ Canal Company does not contest the District Court's holding that the *statutory* $500 per package limitation of liability imposed by COGSA [5] is inapplicable because the damage occurred after the goods were discharged from the vessel. Likewise, it cannot contend that the *contractual* limitation contained in Clause 18 of the Long Form Bill of Lading (note 4, *supra*) is controlling since

basis the freight is adjusted and the carrier's liability, if any, shall be determined on the basis of a value of $500. per package or per customary freight unit, or pro rata in case of partial loss or damage, unless the nature of the goods and a valuation higher than $500 shall have been declared in writing by the shipper upon delivery to the carrier and inserted in this bill of lading and extra freight paid if required and in such case if the actual value of the goods per package or per customary freight unit shall exceed such declared value, the value shall nevertheless be deemed to be the declared value and the carrier's liability, if any, shall not exceed the declared value and any partial loss or damage shall be adjusted pro rata on the basis of such declared value."

Neither Bill of Lading contained a space for insertion of a value in excess of $500 per package and neither made any reference—oblique or otherwise—to the tariff covering port and transhipment operations.

But the long form, exercising the privilege under § 1312 of COGSA to prescribe expressly that the shipment was subject to COGSA relinquished the privilege of prescribing different responsibilities and liability with respect to goods "prior to loading on and subsequent to the discharge from the ship" (§ 1307, COGSA):

"1. This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which

Canal Company knew of the value far in excess of the $500 limit and the tariff did *not* prescribe any additional charges for declared excess value.[6] Canal Company's Water Transportation Division, from two certificates stamped on the face of the shortblading, knew that these nine packages (1100 cubic feet, 13,800 lbs.) were for a specified Canal Company contract. No purpose, therefore, would have been served by a declaration in this unique situation.

■ But the fact that this was a through shipment from New Orleans to Balboa on a through bill of lading which prescribed that Canal Company's liability would be measured by Clause 18 and COGSA "throughout the entire time the goods are in the custody of the carrier" [7] means that the handling tariff

shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. The provisions stated in said Act shall (except as may be otherwise specifically provided herein) govern before the goods are loaded on and after they are discharged from the ship and throughout the entire time the goods are in the custody of the Carrier. The Carrier shall not be liable in any capacity whatsoever for any delay, non-delivery or misdelivery, or loss of damages to the goods occurring while the goods are not in the actual custody of the Carrier."

5. 46 U.S.C.A. § 1304(5).

6. William E. Hall, Rate Analyst, Office of the Comptroller, Budget and Rates Division (called by Canal Company as a witness) described Part One of the tariff, see notes 1 and 2, *supra*, on direct examination:
   "Q Does Part VII of the Tariff pertain to ocean transportation?
   A That is correct.
   Q Is there any provision, or was there in May, 1969 any provision for a higher tariff rate or ocean transportation if the shipper declares a higher value for the goods?
   A Not in Part VII; no."

7. Canal Company signed the short blading for the Master. Clause 2 of the long form expands the contractual Clause

and its restrictive $500 limitation (notes 1 and 2, *supra*) were in effect substantially modified, if not altogether supplanted or superseded.

In any event the handling Tariff limitation (note 2, *supra*) is of no help.[8] This is so even though the construction contract provides that the "free" transportation of supplies for Canal Company projects does not include "the Isthmian handling charge which will be for the account of the contractor, at the *rates* stated in the official PCC tariff schedule." [9] And in this analysis we may assume that the contractor did not know of, but was charged with knowledge of, the local tariff.

Several things lead to this conclusion. First, whether it amounts to supersession or something less, the blading's parenthetical phrase of the Clause Paramount for this through shipment limits departures from COGSA to "(except as may be otherwise specifically provided herein)" (Clause 1, note 4, *supra*). It does not say "except as provided for herein *or in other tariffs of carrier.*"

Even more important, considering that exculpatory terms of tariffs or contracts of carriage are to be narrowly construed,[10] the provision in the construction contract imposing the *costs* for port handling on the contractor "at the *rates* stated in the * * * tariff

---

Paramount (note 4, *supra*) to cover Canal Company in every capacity:

"2. In this bill of lading the word 'ship' shall include any substituted vessel, and any craft, lighter or other means of conveyance owned, chartered, or operated or employed by the carrier; the word 'carrier' shall include the ship, her owner, operator, demise charterer, time charterer, master and any substituted carrier, whether the owner, operator, charterer, or master shall be acting as carrier or bailee; the word 'shipper' shall include the person named as such in this bill of lading and the person for whose account the goods are shipped; the word 'consignee' shall include the holder of the bill of lading, properly endorsed, and the receiver and the owner of the goods; the word 'charges' shall include freight and all expenses and money obligations incurred and payable by the goods, shipper, consignee, or any of them."

8. The critical thing is that this was a through shipment by a single carrier, not the case of a sealeg by one carrier for transshipment by another unrelated carrier, by rail or water or both. Hence Clause 13 is no haven:

"13. The carriage by any transshipping or forwarding carrier and all transshipment or forwarding shall be subject to all the terms whatsoever in the regular form of bill of lading, freight note, contract or other shipping document used at the time by such carrier, whether issued for the goods or not, and even though such terms may be less favorable to the shipper or consignee than the terms of this bill of lading and may contain more stringent requirements as

to notice or claim or commencement of suit and may exempt the on-carrier from liability for negligence. The shipper expressly authorizes the carrier to arrange with such transshipping or forwarding carrier that the lowest valuation of the goods of limitation of liability contained in the bill of lading or shipping document of such carrier shall apply even though lower than the valuaton of the limitation herein. Pending or during transshipment the goods may be stored to shore or afloat at their risk and expense and the carrier shall not be liable for detention."

Indeed Canal Company's tariff structure affirms this. Through shipments by rail to Balboa are for the account of Canal Company (see GC–13(f)(2), note 3, *supra*). On the other hand, for transshipment on non-through movements, Canal Company acts only as agent of the delivering line:

"In handling cargo and making local deliveries in Colon and Panama, the Panama Canal Company acts as the agent of the delivering steamship line, and the liability of the Panama Canal Company shall be limited by the provisions of the bill of lading."

§ 160.02(4).

9. See GC–13(f)(1), note 3, *supra* (emphasis added).

10. *See*, Robert C. Herd & Co. v. Krawill Machinery Corp., 1959, 359 U.S. 297, 79 S.Ct. 766, 3 L.Ed.2d 820, and *cf.*, Hartford Accident & Indem. Co. v. Gulf Refining Co., 5 Cir., 1956, 230 F.2d 346, 355, cert. denied Gulf Refining Co. v. Black Warrior Towing Co., 352 U.S. 832, 77 S.Ct. 49, 1 L.Ed.2d 52.

schedule," (GC–13(f)(1), note 3, *supra*), does not undertake to impose on this sort of contractor-shipper any burden to do anything except *pay* the handling charges. There is, for example, no provision in that contract, or in Part One of the Tariff, for declaring value. And this record is completely silent either as to the work-a-day system set up for such action or, even more significant, why a shipper under a through bill of lading should take any action *except*—and the except is narrowly circumscribed—pay when billed.

And that this ambiguous-amphibious activity's pudding's proof is in the eating, is made clear by the manner in which these handling charges for Canal Company project shipments were handled. On receipt of the bills of lading in the Canal Zone they are sent routinely by the Terminals Division to the Budget and Accounting Division, who in turn sends them to the Construction Division to determine whether that shipment is entitled to free freight. Only then will the shipment be ordered to be released and the consignee notified.[11] Handling charges are ordinarily deducted from progress payments and the consignee in such cases in this way pays the amount billed it by Canal Company subsequent to the cargo having been unloaded because the tariff charges are continually being changed.[11]

■ There is, thus, (i) no occasion for the consignee to give any instructions to Canal Company for it to effect the agreed shipment to Balboa, (ii) no means prescribed for making a declaration, (iii) no real means of knowing what the handling charges are until billed, and hence (iv) no means of knowing what the "premium" charge might be under tariff § 162.39 for excess of $500 valuation.

For a through bill of lading shipment of goods being carried "free" by Canal Company to destination, if the shipper-consignee is required to declare excess value at all—and the if is a big one because of the peculiar Clause Paramount —it is entitled to do so within a reasonable time after it is billed for the handling charges. That this may ostensibly give shipper-consignee a right after the fact to assure unlimited liability for carrier caused loss is just the result of this structure and its operation in which there is no real relationship between limited and unlimited liability.[12]

The scheme ostensibly affording a choice between limited and unlimited liability was enshrouded in such doubt as to its legal application and an effective means by which to exercise it[13] in the course of a continuous movement of the freight by Canal Company from New Orleans to the point of ultimate destination, that it cannot be invoked for failure to declare—once the goods were at slings end at Cristobal—an excess value or pay what months later is computed to be $6.88.

■ This approach minimizes many problems. Naturally, Canal Company stresses the legislatively binding character of a validly promulgated tariff. As an abstract proposition, of course, a valid tariff controls the rights and liabilities of both shipper and carrier with the force of law.[14] But "a tariff is not an

11. See pp. 9, 10 and 7 of Sommer's brief, citing original transcript at 148, 51, 70.

12. The tariff dollar limit appears to have been a complete afterthought. The Claims Division rejected the claim because of "insufficient packaging." The extent to which assessing and collecting handling charges is a casual event is shown by the act that in the routine deductions against the contractor's progress payments (note 11, *supra*) the amount billed and deducted was $24.50 against a correct sum of $96.73 to which would be added $6.88 for excess valuation. Canal Company has foregone any claim for the deficiency.

13. Clearly there was neither warning in the through bill of lading nor means of making an excess declaration at time of initial shipment aboard the vessel at New Orleans.

14. State of Israel v. Metropolitan Dade County, 5 Cir., 1970, 431 F.2d 925, 928; Carter v. American Telephone & Telegraph Co., 5 Cir., 1966, 365 F.2d 486,

abstraction." United States v. Western Pacific Railroad Co., 1956, 352 U.S. 59, 66, 77 S.Ct. 161, 166, 1 L.Ed.2d 126, 133. We have many times applied this. And the notice of the need for a choice and an effective means for exercising it are essential. "Only by granting its customers a fair opportunity to choose between higher or lower liability by paying a correspondingly greater or lesser charge can a carrier lawfully limit recovery to an amount less than the actual loss sustained." New York, New Haven and Hartford Railroad Co. v. Nothnagle, 1953, 346 U.S. 128, 135, 73 S.Ct. 986, 990, 97 L.Ed. 1500, 1507.[15]

Likewise, this approach does not bring into the slightest question the validity of "agreed valuation" clauses with a choice of rates.[16] Nor does it remotely suggest that Canal Company either waived the various provisions or was estopped to assert them merely because shipper-consignee was unaware of them.[17]

By the structure, as interpreted by us, and the absence of an effective means of exercising a choice Canal Company cannot cast the burden on shipper-consignee for the failure to declare what it knew, or to pay the now computed $6.88. "Tariffs must not be made cunningly devised nets in which to entangle unsuspicious or inexperienced shippers,"[18] particularly when the seine is cast by a political instrumentality of the United States.[19]

496, cert. denied, 1967, 385 U.S. 1008, 87 S.Ct. 714, 17 L.Ed.2d 546; Compania Anonima Venezolana De Navegacion v. A. J. Perez Export Co., 5 Cir., 1962, 303 F.2d 692, 696 and note 12, cert. denied, 371 U.S. 942, 83 S.Ct. 321, 9 L.Ed.2d 276; United States v. Associated Air Transport Co., 5 Cir., 1960, 275 F.2d 827, 833; Lowden v. Simonds-Shields-Lonsdale Grain Co., 1939, 306 U.S. 516, 520, 59 S.Ct. 612, 614, 83 L.Ed. 953, 957; Crancer v. Lowden, 1942, 315 U.S. 631, 635, 62 S.Ct. 763, 765, 86 L.Ed. 1077, 1080.

15. See also Sorensen-Christian Industries, Inc. v. Railway Express Agency, Inc., 4 Cir., 1970, 434 F.2d 867, 870; Chandler v. Aero Mayflower Transit Co., 4 Cir., 1967, 374 F.2d 129, 137; Hamilton v. Stillwell Van & Storage Co., 3 Cir., 1965, 343 F.2d 453, 454; Rhoades v. United Air Lines, 3 Cir., 1965, 340 F.2d 481, 486.

16. E. g., Boston and Maine Railroad Co. v. Piper, 1918, 246 U.S. 439, 38 S.Ct. 354, 62 L.Ed. 820; American Express Co. v. United States Horse Shoe Co., 1917, 244 U.S. 58, 37 S.Ct. 595, 61 L.Ed. 990; George N. Pierce Co. v. Wells Fargo & Co., 1915, 236 U.S. 278, 35 S.Ct. 351, 59 L.Ed. 576; Great Northern Railway Co. v. O'Connor, 1914, 232 U.S. 508, 34 S.Ct. 380, 58 L.Ed. 703; Boston & Maine Railroad v. Hooker, 1914, 233 U.S. 97, 34 S.Ct. 526, 58 L.Ed. 868; Atchison, Topeka & Santa Fe Railway Co. v. Robinson, 1914, 233 U.S. 173, 34 S.Ct. 556, 58 L.Ed. 901; Atchison, Topeka & Santa Fe Railway Co. v. Moore, 1914, 233 U.S. 182, 34 S.Ct. 558, 58 L.Ed. 906; Adams Express Co. v. Croninger, 1913, 226 U.S. 491, 33 S.Ct. 148, 57 L.Ed. 314; Kansas City Southern Railroad Co. v. Carl, 1912, 227 U.S. 639, 33 S.Ct. 391, 57 L.Ed. 683; Hart v. Pennsylvania Railroad Co., 1884, 112 U.S. 331, 5 S.Ct. 151, 28 L.Ed. 717.

Where required, a voluntary choice between rates is essential because a tariff limitation on liability concededly binds the shipper regardless of whether the contract of carriage refers to it. Tishman & Lipp v. Delta Airlines, 2 Cir., 1969, 413 F.2d 1401, 1403–1404. We have no occasion to intimate any holding as to necessity for a choice of rates for application of § 1304(5) of COGSA for damage during the "carriage of goods" from ship's tackle to ship's tackle, § 1301(d) COGSA.

17. See, Davis v. Cornwell, 1924, 264 U.S. 560, 44 S.Ct. 410, 68 L.Ed. 848; Davis v. Henderson, 1924, 266 U.S. 92, 45 S.Ct. 24, 69 L.Ed. 182; Illinois Steel Co. v. Baltimore & Ohio Railroad Co., 1944, 320 U.S. 508, 511, 64 S.Ct. 322, 324, 88 L.Ed. 259, 264; Arkansas Oak Flooring Co. v. Louisiana & Arkansas Railway Co., 5 Cir., 1948, 166 F.2d 98, cert. denied, 334 U.S. 828, 68 S.Ct. 1338, 92 L.Ed. 1756.

18. Norfolk Southern Railroad Co. v. Chatman, 1917, 244 U.S. 276, 282, 37 S.Ct. 499, 501, 61 L.Ed. 1131, 1135.

19. We have previously rejected Panama's strenuous effort to avert liability by invoking the tottering doctrine of sovereign immunity. The philosophy underlying our approach to the facts of that case applies here: "A reasonable interpretation produces a reasonable result. An unreasonable interpretation produces a harsh absurdity." Gulf Oil Corp. v. Panama Canal Co., 5 Cir., 1969, 407 F.2d 24, 32.

Sommer's cross appeal from the District Court's denial of prejudgment interest is likewise well taken. By joint pretrial stipulation it was agreed that Sommer's damages amounted to $9,610.-85. Although by the judgment of July 30, 1971, interest was initially awarded from the date of discovery of the loss, the Court amended the judgment on Canal Company's motion of August 8, 1971, on the theory that the stipulated figure excluded interest citing Morse Boulger Destructor Co. v. Camden Fibre Mills, Inc., 3 Cir., 1956, 239 F.2d 382; Arkla Exploration Co. v. Boren, 8 Cir., 1969, 411 F.2d 879.

■■ We agree that within the time for appeal the trial Court had the power to correct its own judgment, whether or not based on F.R.Civ.P. 60(b). Meadows v. Cohen, 5 Cir., 1969, 409 F.2d 750, 752, n. 4; Aldridge v. Union Bankers Insurance Co., 5 Cir., 1972, 457 F.2d 501. See also, McDowell v. Celebreeze, 5 Cir., 1962, 310 F.2d 43, 44. But we disagree with this hypercritical reading of the stipulation. This was, we believe, the parties' efforts to reduce to a fixed amount the aggregate of the items expended or lost as would ordinarily be testified to by witnesses. Theoretically, of course, the Admiralty considers interest as a part of the loss, not just for forbearance in payment. But there is no indication that in fixing this odd figure the parties were agreeing as to interest, either the rate payable or the time of commencement.

Of course interest in the Admiralty is left generally to the discretion of the Judge. But it was not denied on that ground. Indeed, in relying wholly on his construction of the stipulation the Judge acknowledged that he had initially awarded interest because of equitable considerations.[20] Freed now from his too rigid reading of the stipulation we reinstate these equities and the interest.

Modified and affirmed.

---

20. In the memoranda opinion deleting predecree interest Judge Crowe said:

"Interest awards in admiralty are the general rule and disallowance thereof is supportable only in the face of exceptional circumstances. 'It is generally recognized that the allowance of interest on awards in admiralty is a matter lying within the trial court's discretion.' O'Donnell Transp. Co., Inc. vs. City of New York, [2 Cir.] 215 F.2d 92; American Union Transport Co., Inc. v. Aguadilla Terminal Company, [5 Cir.] 302 F.2d 394 (1962); 1962 AMC 2471. As interest had been prayed for in the complaint and the plaintiff had been deprived of the use of his funds during the period from about the date of the injury, even though no argument was had on the question it was felt that an allowance of interest would be equitable and was therefore adjudged."