WEST INDIA INDUSTRIES, INC.,
Plaintiff-Appellant,

v.

VANCE & SONS AMC–JEEP,
Defendant-Appellee.

WEST INDIA INDUSTRIES, INC.,
Plaintiff-Appellant,

v.

TOMMIE VAUGHN MOTORS, INC.,
Defendant-Appellee.

Nos. 80–1504, 80–2162.

United States Court of Appeals,
Fifth Circuit.*
Unit A

April 9, 1982.

Rehearing and Rehearing En Banc
Denied May 21, 1982.

Brown, Circuit Judge, filed dissenting opinion.

William H. Seele, Houston, Tex., for plaintiff-appellant.

James H. Elder, III, Houston, Tex., for Vance & Sons AMC-Jeep.

Alfred C. Schlosser & Co., Jerry Sadler, Houston, Tex., for Tommie Vaughn Motors, Inc.

Robert Eikel, Houston, Tex., for amicus curiae West Gulf Maritime Assoc.

Before BROWN and GARZA, Circuit Judges, and SCHWARTZ, District Judge **.

CHARLES SCHWARTZ, Jr., District Judge:

Appellant, West India Industries, Inc. (West India) is an ocean carrier which brought these two actions in admiralty seeking recovery of unpaid ocean freight. Defendants-Appellees, Vance & Sons AMC–

---

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

** District Judge of the Eastern District of Louisiana, sitting by designation.

Jeep (Vance) and Tommie Vaughn Motors, Inc. (Vaughn) are Houston, Texas automobile dealers who were allegedly the shippers of the cargoes of motor vehicles for which freight payments are now sought by West India.

The issue presented to the Court by these consolidated appeals is whether or not an ocean carrier is entitled to recover unpaid ocean freight from a party designated as shipper on the carrier's negotiable bill of lading by a licensed freight forwarder which was without authority to make such designation. The two courts below to which this question was presented answered in the negative and denied recovery to the plaintiff carrier which now appeals from those adverse judgments. We affirm.

In the latter part of 1978 Mr. David Trejo, a resident of South America, and his brother Raphael Trejo of Houston, Texas were engaged in obtaining vehicles in Houston for shipment to South America. They were assisted in this endeavor by Mr. Marvin Frank, a self employed automobile broker, who upon a request from the Messrs. Trejo, would contact Houston automobile dealerships for price quotations on certain types and numbers of vehicles as specified by the Trejos. In the event that the automobiles were purchased by the Trejos, Mr. Frank was paid a commission for his services.

In connection with both the shipments forming the basis of West India's claims herein, Mr. Frank contacted the respective automobile dealerships. Through Vance he negotiated the sale of seventeen (17) Jeep Wagoneers which were subsequently carried by West India on board the M/V INAGUA PILOT which departed Houston on September 4, 1978, en route to Puerto Cabello, Venezuela. Through Vaughn he negotiated the sale of fifteen (15) Ford trucks which in December, 1978, were transported on board West India's M/V JUNO and M/V INAGUA BAY from the port of Houston to Guanta, Venezuela.

In both transactions Mr. Frank represented to the dealership that the only responsibility of the dealership would be that of

obtaining the vehicles. The dealers were to have no responsibility for the shipping. of the vehicles which was to be handled by the Trejos through Houston agents other than Mr. Frank (who dealt solely with negotiating the sale of the automobiles). However, the dealers were advised that for reasons of economy the Trejos desired to provide payment for the vehicles, their shipment, and the commissions due persons such as Mr. Frank by means of a single letter of credit. It was understood by both Vance and Vaughn that the entire amount to be drawn on the letter of credit would be in their names as beneficiary and, upon receipt, they agreed to deduct the cost of the vehicles sold and issue their own checks to other involved parties.

In each instance the vehicles were ordered by the dealership and delivered to their places of business in Houston. Upon delivery, representatives of the Trejos physically transported the vehicles from the dealerships to the port facility from which they were to be shipped. In each case the Trejos engaged one Muhammed Paksima and his company, Paxy's International, Inc. (Paxy's), a licensed freight forwarder, to handle the shipments. In the Vance case Paxy's actually performed the freight forwarding services. In the Vaughn case Paxy's secured the services of another licensed freight forwarder, Cargo Consultants, Inc. (Cargo Consultants) to perform the services.

In each case the freight forwarder contacted West India regarding carriage of the vehicles and advised that the shipment was for the account of Vance and Vaughn. In each case the agreement between the forwarder and the carrier was confirmed .in a booking note. Thereafter the freight forwarders prepared ocean bills of lading and export declarations which indicated that Vance and Vaughn were the shippers of the automobiles.

In each case West India issued its bill of lading "Freight prepaid" although no freight payment had actually been received. West India's procedure in this regard was apparently in conformity with Rule 7(c) of

West India's applicable tariff which provided:

(c) Freight and other charges provided for in this tariff must be paid in full by the shipper and his authorized freight forwarder, if any, as billed upon receipt of the goods for carriage and tender of the Bill of Lading by the carrier; provided, that the carrier may, at its discretion, extend credit to a shipper or, when credit is requested or accepted by a freight forwarder who arranges shipment on behalf of a shipper, to the shipper and his authorized freight forwarder jointly and severally for a period not to exceed fifteen (15) working days excluding Saturdays, Sundays and legal holidays from the date of sailing of the vessel from the port at which the cargo is loaded.

In neither case was there a specific request for credit by the freight forwarder either in its own behalf or on behalf of the named shipper. West India's extension of credit in these instances was apparently its usual course of conduct under the circumstances. At no time did West India make any inquiry as to the credit-worthiness of Vance or Vaughn nor as to the authority of Paxy's and Cargo Consultants to act for them.

With regard to both transactions the automobile dealerships were named as beneficiaries of letters of credit procured by the Trejo interests. In each case a representative of the dealership was provided with the supporting documentation required by the letter of credit including the bills of lading, all of which documentation was prepared by the freight forwarder. Upon receiving payment, in accordance with their prior agreements with Mr. Frank, Vance and Vaughan issued their own checks to Mr. Frank and to Paxy's. Despite payment to Paxy's of amounts representing the ocean freight, Paxy's never made payment to West India, or, in the Vaughn case, to Cargo Consultants which in turn never paid West India.

Following non-receipt of the freight monies, West India initially sought payment from the respective freight forwarders and thereafter attempted to collect from the defendant dealerships. Meeting with no success in either endeavor, West India filed these lawsuits. In two separate proceedings, the trial court found that Vance and Vaughn were not the shippers of the goods in question and denied recovery.

While we do not adopt the reasoning followed by the trial courts, we find that they reached the correct results given the factual situations at issue.

Clearly the naming of Vance and Vaughn as shippers on the bills of lading and export declarations for the shipments was without the knowledge of the dealers, and such action was completely contrary to the vehicle purchaser's representations that the dealerships would have absolutely no responsibility for shipment. The naming of the dealerships as shipper was an action taken by the freight forwarders retained by the purchaser's agent for the purpose of reducing costs to the purchasers which would be incurred if multiple letters of credit were obtained. In each case the ultimate consignees, acting through their agents, were the shippers of the vehicles which were purchased in Houston from Vance and Vaughn to be exported by the purchasers. Vance and Vaughn were never aware that, by acceding to the wishes of the purchaser with regard to the single letter of credit, they had undertaken to act as shippers of the vehicles. Neither Vance nor Vaughn ever gave anyone authority to name them as shippers and in fact would have denied such authority had it been requested of them.

The Shipping Act of 1916, 46 U.S.C. § 801 et seq. does not define the term "shipper." However, it has been jurisprudentially defined as, "...the owner or person for whose account the carriage of goods is undertaken." *Compagnie Generale Transatlantique v. American Tobacco Co.*, 31 F.2d 663, 667 (2nd Cir. 1929) *cert. den'd* 280 U.S. 555, 50 S.Ct. 16, 74 L.Ed. 611 (1929); *Norman G. Jensen, Inc. v. Federal Maritime Commission*, 497 F.2d 1053, 1056 (8th Cir. 1974).

In the instant cases the automobile dealerships merely sold the vehicles. Their

transport to the dock and their export therefrom were controlled solely by agents of the consignees in Venezuela. Both dealerships were assured that they had absolutely no responsibility for shipment.

Also clear from the evidence is the fact that West India had no knowledge of the nature of the agreements between the dealerships and the purchasers' agents. West India relied solely upon the representations of the freight forwarders as to the identity of the shipper for whose account the shipment was to be. The carrier accepted the designation of the shipper made by the freight forwarders on the bills of lading and made no further inquiry in that regard as was its custom. The carrier allowed the freight forwarders to prepare the bills of lading and other documentation in order for the freight forwarders to qualify for payments of commissions from the carrier pursuant to 46 U.S.C. § 841b. Finally, the carrier issued "freight prepaid" bills in its own discretion and not at the request of the named shippers, Vance and Vaughn, who were unaware of their designation as such.

▮▮▮▮ Federal maritime law embraces the principles of agency. *Kirno Hill Corp. v. Holt*, 618 F.2d 982, 985 (2nd Cir. 1980). The facts here present compel the conclusion that the freight forwarders with whom West India dealt lacked authority to enter contracts of carriage on behalf of Vance and Vaughn. However, West India accepted without further inquiry the bare statements of the freight forwarders' employees to the effect that they represented the dealerships. We hold that in so doing West India acted at its own peril. The mere representation of the fact of agency does not create that relationship and the party to whom such representation has been made bears the burden of inquiring to determine if authority does in fact flow from the alleged principal. *Karavos Compania Naviera S.A. v. Atlantica Export Corp.*, 588 F.2d 1, 10–11 (2nd Cir. 1978). The mere fact that West India customarily took the word of the freight forwarders with which it dealt as to the identity of their principals cannot serve to bind parties who were so designated without authority and who did not in fact act in the capacity of shippers of goods.

Both the trial courts relied upon the holding of *Farrell Lines, Inc. v. Titan Industrial Corp.*, 306 F.Supp. 1348 (S.D.N.Y.1969) aff'd 419 F.2d 835 (2nd Cir. 1969) *cert. den'd* 397 U.S. 1042, 90 S.Ct. 1365, 25 L.Ed.2d 653 (1970). However, under the circumstances here present such reliance is misplaced. *Farrell* addresses itself to the liability of a shipper upon default of a freight forwarder which it has retained. (*See, contra., Compania Anonima Venezolana de Navegacion v. A. J. Perez Export Co.*, 303 F.2d 692 (5th Cir. 1962) *cert. den'd* 371 U.S. 942, 83 S.Ct. 321, 9 L.Ed.2d 276 (1962)). In the cases before the Court the shipper who retained the freight forwarder is not before the Court and accordingly the question of liability vis a vis the actual shipper and the carrier is not properly addressed at this juncture.

We also note that as an alternative finding one of the courts below held Paxy's International, a licensed freight forwarder, to be the shipper. Such finding is clearly erroneous as by statute a licensed freight forwarder is precluded from acting in such capacity. 46 U.S.C. § 801; *Zanelli v. Federal Maritime Commission*, 524 F.2d 1000 (5th Cir. 1975); *Norman G. Jensen, Inc. v. Federal Maritime Commission, supra.*

In summary we hold that Vance and Vaughn were designated as shippers without authority by agents of the consignee; that they in fact had no responsibility for shipment of the vehicles; and that the carrier relied to its detriment upon the unsupported representations of the freight forwarders as to the principals for whom they acted.

The judgments of the trial courts are AFFIRMED AS MODIFIED.

JOHN R. BROWN, Circuit Judge, dissenting:

I find myself unable to concur in the Court's opinion in this case since it flies in the face of the evidence. Contrary to the

Court's position that the freight forwarders were acting without authority and were agents of the ultimate consignee who was also the shipper, I do not believe that this decision turns on strict principles of agency law. Rather, the outcome should be determined by the uncontradicted evidence comprising exhibits which establish that Vance & Sons AMC–Jeep (Vance) and Tommie Vaughn Motors, Inc. (Vaughn) were the shippers, whether they liked it or not, as to their respective sales and consequently were liable as shippers for the ocean freight.

Although Vance and Vaughn separately disclaimed any purpose, or even a desire, to engage in foreign export trading, each of these successful enterprises had to realize certain inescapable business facts. Each had vehicles to sell. Foreign purchasers desired to buy these vehicles. Before releasing effective control over the vehicles each seller had to obtain payment of the agreed sales price. On the other hand, each foreign purchaser could not simply remit to the seller the agreed price on the assumption that the seller, on receipt of the funds, would then ship the vehicles. Additionally, the buyer would need to be assured that, in addition to passing of formal legal title, the goods would physically be shipped to be transported by a carrier whose freight charges somehow had to be paid. Each

buyer, each seller had a legitimate business need for protection to assure (i) payment by the buyer and (ii) delivery by the seller.

These mutual, essential business goals could be met by the use of the time honored device of a letter of credit arranged by, or on behalf of, the buyer, assuring payment to the seller conditioned on the seller furnishing or surrendering the specified essential documents and complying with other specified conditions. Typical of these would be bills of sale, delivery receipts, transfer of title to permit any required registration and, most important, clean onboard ocean bills of lading showing receipt of the goods by the carrier and whether freight was prepaid or is collect. In essence, the buyer (or its bankers) lays down the conditions precedent to payment by the issuer of the letter of credit. If payment is to be made, such conditions must be met. Conditions resting on the seller must be met by the seller.

This is precisely what was done here. Letters of credit were established in favor of both Vance [1] and Vaughn which covered not only the agreed invoice price of the vehicles (jeeps and trucks) but, of great importance, the cost of ocean freight and other expenses such as brokers' commissions. These conditions were met by each seller.[2] There is no dispute that, as to each,

---

1. In Vance's case, the letter of credit, in the amount of approximately $165,000.00 was confirmed and paid by the Bank of America International of Texas. The letter was amended several times, reflecting among other changes, an allowance of partial shipments, extension of date, and change of consignee. The original letter of credit, issued April 28, 1978, for $291,-180 (to cover two shipments, the first of which is not at issue in this case), stated:

   We hereby issue in your favour this documentary credit which is available by PAYMENT against presentation of the following documents

   . . . .

   Full set Clean on Board Ocean Bills of Lading, straight consigned to Banco de Lara, C.A., Caracas (Order Bills of Lading not permitted), dated not later than August 20, 1978 and marked "FREIGHT PRE-PAID".

   . . . .

We hereby engage that payment will be duly made against documents presented in conformity with the terms of this credit.

2. The exhibits prove conclusively that Vance, on its business account, wrote the following checks:

   Sept. 5, 1978   $11233.60 to Paxy's International

   Sept. 7, 1978   $8320.00 to Rafael Trejo

   Sept. 12, 1978   $2125.00 to Marvin Frank Motor Co.

   The typed invoice from Paxy's to Vance of August 31, 1981 shows:

   (1) Forwarding Fee
   (½ of 1% of $151,782.78)          $   758.91

   (2) Ocean Freight and/or
   Charges Per B/L                      11,339.34

   (3) Unloading/Terminal
   use charges                             403.92

   (4) Wharfage Charges                     32.05

   (5) Cartage                             670.00

the bills of lading (executed by the carrier) showed on the face that Vance and Vaughn, respectively, were the "shipper", and the bills of lading were expressly endorsed by each through authorized persons.

This was no paper formalism. There was a conscious awareness of the need of conforming documents to secure payment under the letters of credit.[3] The necessary documents were prepared on behalf of each seller by John Heiskell of Paxy's,[4] the freight forwarder.[5] The letter of credit was also examined in great detail by Vance's own bank, First City National Bank, which was providing Vance with a line of credit secured by the letter of credit.

| (6) Documentation | |
|---|---|
| commercial invoice | 5.00 |
| banking | 10.00 |
| | $13,219.22* |

* The total of $13,219.22 is then by handwritten notation reduced by $1985.62 with the reference "Less Repairs", with total of "$11,233.60 paid" and initialed by "JCH". This offset, as testified to by Mr. Vance, was for repairs to two jeeps in the first shipment which were damaged en route to the dock but repaired and included within the second shipment, the one at issue in this case.

3. To questions by West India's counsel, Vance testified:
Q. Did you receive your money under the letter of credit?
A. Yes.
Q. Was Mr. Heiskell [an employee of Paxy's] authorized to sign these documents on your behalf, or Vance & Sons' behalf?
A. That was part of the requirements of the letter of credit to release the money, was that the proper documents be presented to the bank.
Q. Now, as I understand it, there no doubt was a certain amount or number of bills of lading, original bills of lading that had to be produced, is that correct?
A. Yes.
Q. And those bills of lading were submitted to the bank, so you could receive your funds, is that correct?
A. Uh-huh.
Q. And you had knowledge of the existence of the letter of credit?
A. Yes.
Q. You had knowledge of the existence of the documents that were to be presented to the bank?
A. We assumed that they were prepared properly.
\* \* \* \* \* \*

An officer of this bank testified that the letter of credit was revised several times in accordance with First City's demands. Although this officer stated that he did not examine the documents at closing, this was unimportant since "I would have no particular need to, as they were acceptable to the Bank of America, and as long as they handed me the check I would consider First City's interest and Vance & Sons' interest well protected."

Although the record as to Vaughn's case is not so precise or record perfect, the same procedure was followed by a secretary, the authorized agent.[6] This agent actually en-

Q. You knew that in order to pick up the check from the Bank of America for $165,000 certain documents had to be there?
A. Yes.
Q. Who brought those documents to the meeting when you got the check?
A. John Heiskell.

4. In the Vaughn case, Paxy's used Cargo Consultants, Inc., another freight forwarder, to assist in the shipment.

5. See, for example, Vance's responses to counsel for West India concerning documents submitted to the bank to receive payment under the letter of credit:
Q. Were those documents prepared under your signature?
A. You mean the bills of lading, and that sort of thing?
Q. Whatever documents were required to be submitted to the bank for the letter of credit.
A. Not under my signature.
Q. Did you know that they were being done?
A. Yes.
Q. Do you know who did them on behalf of Vance & Sons?
A. Paxy International.
Q. Do you know who in particular at Paxy?
A. That would have been, I guess, John Heiskell.

6. The secretary responded to counsel for West India:
Q. Is there anybody at Tommie Vaughn Motors besides yourself who was involved in either reviewing the paperwork or making the sale or anything?
A. No.
Q. You are the only person that did that?
A. I'm the only person.
Q. Did you have to solicit anyone for approval of the sale?

dorsed the bills of lading and also prepared the delivery receipts on Vaughn letterhead. She knew that all the documents had to be approved by the bank.[7] She understood that under the letter of credit it was necessary for the freight forwarder to bill Vaughn for his charges.[8]

To get funds for payment of the vehicles the sellers each had to (i) supply clean on-board ocean bills of lading, freight prepaid and (ii) pay the ocean freight, brokerage freight forwarder commissions, etc. Each, through competent, presumably literate, knowledgeable business people, did just that. There was no deception practiced on them by the freight forwarder. There was no misrepresentation that each, rather than the ultimate foreign buyer, was the shipper. The letter of credit called for just this. The bills of lading were plain on the face and indeed each seller additionally endorsed the straight (not order) bills of lading. Under the letters of credit, funds were also paid directly to each seller to pay ocean freight and related charges. That this was a knowing consensual act by mature adult actors is conclusively proved by checks drawn on the business bank account by Vance,[9] one of which was in the precise amount of the ocean freight charges.

That this payment was made by a check payable to the forwarder, not the carrier alone or jointly with the forwarder, was the conscious free act of each seller in satisfaction of the obligation of each under the letter of credit. Even without putting it in terms of agency law, the failure of the forwarder as payee to pay these amounts over to the carrier was a risk each payor ran and the loss from this misplaced trust must likewise be borne by each of them, not the carrier, to whom the law extends virtually an absolute right to payment of freight.

There can be no doubt of the existence and availability of this legal right. Under the Shipping Act of 1916, 46 U.S.C. § 817(b)(1), an ocean carrier must file tariffs with the Federal Maritime Commission. The tariff in effect here incorporated the credit terms, providing that credit could be extended to a shipper and his authorized freight forwarder jointly and severally.[10] "A tariff required by the appropriate regulatory statute, like the law of the Medes and Persians which altereth not is more

---

A. Not really, you know. Mr. Vaughn trusts my judgment and—

**7.** To questions by counsel for West India, she stated:

Q. And based on your limited experience in the import-export shipping, it seemed like everything was in control?

A. * * * I figured if anything was not right that the bank would not okay this letter of credit.

Q. So all the paperwork has to be approved by the Bank of the Southwest?

A. Right.

Q. And it was approved?

A. It was approved.

**8.** Again in exchanges with West India's counsel, she stated:

Q. Could you explain for me why Muhammed Paksima with Paxy's International invoiced Tommie Vaughn Motors for the charges that it incurred as, operating as a freight forwarder which are reflected on those two invoices?

A. Why did they invoice us?

Q. Yes; why did they invoice you?

A. Because I had to collect the total amount of money from the bank and that was the only way they could get their money, see.

**9.** See item (2) in note 2 *supra*.

**10.** RULE 7—PAYMENT OF FREIGHT CHARGES (C)

(a) All freight and charges must be prepaid in currency of the United States in the United States. Freight collect shipments will be accepted only upon prior arrangement with the carrier.

\* \* \* \* \* \*

(c) Freight and other charges provided for in this tariff must be paid in full by the shipper and his authorized freight forwarder, if any, as billed upon receipt of the goods for carriage and tender of the Bill of Lading by the carrier; provided, that the carrier may, at its discretion, extend credit to a shipper or, when credit is requested or accepted by a freight forwarder who arranges shipment on behalf of a shipper, to the shipper and his authorized freight forwarder jointly and severally, for a period not to exceed fifteen (15) working days excluding Saturdays, Sundays and legal holidays from the date of sailing of the vessel from the port at which the cargo is loaded.

than a consensual contract. It has the force of law with the analogous dignity of a statute." *State of Israel v. Metropolitan Dade County, Florida,* 431 F.2d 925, 928 (5th Cir. 1970) (citation omitted). *See Sommer Corporation v. Panama Canal Company,* 475 F.2d 292, 297–98 n.14 (5th Cir. 1973). Carriers must be paid for their services. *Compania Anonima Venezolana De Navegacion v. A. J. Perez Export Co.,* 303 F.2d 692, 695–96, 1963 A.M.C. 281 (5th Cir.), *cert. denied,* 371 U.S. 942, 83 S.Ct. 321, 9 L.Ed.2d 276 (1962); *Bartlett-Collins Co. v. Surinam Navigation Co.,* 381 F.2d 546, 549 (10th Cir. 1967).

The trial court's findings and those of this Court that Vance and Vaughn were not the shippers is simply contrary to and not supported by the evidence. The bills of lading, essential requirements of the letters of credit, speak for themselves, naming each of the car dealers as the shipper. The booking notes and export declarations also support a compelled finding of each car dealer as shipper.

Based on statutory and case law which states that a freight forwarder cannot be a shipper,[11] the Court correctly holds that the finding of the District Court (in the Vaughn case) that Paxy International was the shipper is clearly erroneous. However, the panel's finding that the ultimate consignees, acting through their agents, were the shipper in each case is equally unfounded, if not completely superfluous or irrelevant, to the question of the liability of the shipper under the tariff (see note 10 *supra*), the bill of lading specifically naming the shipper and the obligations imposed by the letters of credit.

\* \* \*

To get its money, each seller had to furnish to the correspondent bank a prepaid clean onboard bill of lading. To obtain the bill of lading, the carrier had to be paid. To enable that to be accomplished by the buyer, the letter of credit supplied the funds for the seller to pay freight. These funds were transferred to the seller for this purpose. The seller, by checks drawn on its own account, undertook to satisfy this obligation. The seller chose to make this payment to the forwarder. In effect, the seller chose another to act for it in fulfilling the condition imposed on seller as a condition to receiving payment for the goods. The seller trusted the forwarder. The forwarder breached that trust.

In the meantime the carrier, whom the law compels to collect full freight, is out in the cold due to the failure of the party selected by the seller to fulfill its commitment.

As the seller was both the shipper (on whom the law places the obligation to pay freight) and also the one who selected the party to make that payment, every principle of the law of transportation and agency would lay responsibility on the seller-shipper.

To the Court's failure to do that, I must earnestly dissent.

---

11. 46 U.S.C. § 801 expressly precludes a licensed freight forwarder from acting as a shipper. *See Zanelli v. Federal Maritime Commission,* 524 F.2d 1000 (5th Cir. 1975); *Norman G. Jensen, Inc. v. Federal Maritime Commission,* 497 F.2d 1053 (8th Cir. 1974).