**ATLANTIC & GULF STEVEDORES, INC., Plaintiff-Appellant,**

v.

**ALTER COMPANY, Defendant-Appellee,**

**AGS Chartering et al., Defendants.**

**No. 77–3506.**

United States Court of Appeals, Fifth Circuit.

May 19, 1980.

Deutsch, Kerrigan & Stiles, Allen F. Campbell, New Orleans, La., for plaintiff-appellant.

Montgomery, Barnett, Brown & Read, Machale A. Miller, New Orleans, La., for defendant-appellee.

Before WISDOM, GOLDBERG and HENDERSON, Circuit Judges.

PER CURIAM.

In view of the almost completely factual nature of this case, we affirm on the basis of the district court's opinion that is appended below. We imply no opinion as to the proper result if Alter's obligation had not simply been the delivery of its cargo to Mile 151, Paulina, Louisiana. Further, we express no opinion whether it would be proper for a stevedore firm like A&G to charge a barge company like Alter for fleeting and shifting services under river custom or due to the policy considerations favoring the free movement of river traffic. Since the record is totally devoid of evidence concerning these latter two concerns, we cannot address them. AFFIRMED.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ATLANTIC & GULF STEVEDORES, INC. | NO. 76–2368 |
| VERSUS | CIVIL ACTION |
| ALTER COMPANY, ET AL. | SECTION D |

### MEMORANDUM OPINION

Ralph E. Smith, Esq.
Allen F. Campbell, Esq.
  Deutsch, Kerrigan & Stiles
  Attorneys for Plaintiff

Machale A. Miller, Esq.
  Montgomery, Barnett, Brown & Read
  Attorneys for Defendants

EDWARD J. BOYLE, Sr., District Judge:

Plaintiff, Atlantic & Gulf Stevedores, Inc. (A&G), owner and operator of a barge fleeting facility on the Mississippi River near Paulina, Louisiana, instituted this action[1] against eleven enumerated barges, *in rem*, and their owners, *in personam*, to recover the value of tug, fleeting, and shifting[2] services rendered by A&G prior and

---

1. The Complaint alleges an admiralty and maritime claim within the meaning of Rule 9(h) of the Fed.R.Civ.Pro.

2. The term "shifting" was used interchangeably with the term "switching" by A&G and

subsequent to the transfer of the barges' cargoes into ocean-going vessels at A&G's ship-mooring and floating elevator facility, which is also located at the Paulina site.

Defendant Alter Company (Alter), as owner of a number of the barges, as the operator or charterer of the remaining barges, and as the carrier of the barges' cargoes delivered to Paulina, has been invoiced by A&G for all charges in question. Plaintiff claims that Alter is indebted to it for the value of the charges based on three theories: (1) Alter, through "use" of A&G's marine terminal facilities, is subjected to the terms of a document entitled "Marine Terminal Tariff for the Paulina Fleet" (Paulina Tariff), filed with and approved by the Federal Maritime Commission,[3] the applicable provisions of which became a contract between A&G and Alter even in the absence of Alter's consent; (2) Alter's consent to pay, though not express, might be implied from the act of delivery of the barges to A&G's operations at Paulina, particularly in view of the custom of payment by other barge lines similarly situated; and, (3) Alter came under a legal duty, via a quasi contract, to compensate A&G for the performance of the services as a result of benefits which A&G thereby conferred on Alter, whether or not an enforceable contract was present between the parties.

The case proceeded to trial by the Court on the question of Alter's *in personam* liability.[4] We took time to consider and now record our findings of fact and conclusions of law.

The tug, fleeting and shifting services forming the basis of the disputed charges were performed during the period October of 1975 through January of 1976 and represent several steps in the movement of bulk grain commodities, destined for export, from producers-shippers to ocean-going vessels. Preceding those steps, Alter, in its capacity as a carrier by water and pursuant to contracts of affreightment between Alter and shippers Quincy Soybean Company (Quincy) and The Pillsbury Company (Pillsbury), transported a number of consignments of soybean meal in the barges eventually to be handled by A&G from points of origin in Illinois and Arkansas to a destination on the Mississippi River. According to the bills of lading evidencing receipt of the consignments,[5] the destination of each consignment was "Mile 151, E. Bank, Paulina, Louisiana." Plaintiff, under the corporate name Atlantic & Gulf Stevedores, Inc., owned and operated both a direct transfer facility for bulk grain cargoes (consisting of a floating grain elevator and a number of floating cranes) and a port terminal (consisting, *inter alia*, of barge fleeting and ship-mooring sites and offering a variety of services in connection therewith)[6] located between approximately Mile 150.5 and Mile 151.5 on the east bank of the river.[7] Each bill of lading required that Alter notify A&G and Schwartz Forwarding Co., identified as a freight forwarder. The bills of lading also indicated that the cargoes to be transported either were consigned to Continental Grain Company (Con-

---

defendant Alter Company throughout these proceedings.

3. *See* Exhibit P–15. Operators of marine terminals are required to file tariffs with the Federal Maritime Commission under 46 CFR §§ 533.1 *et seq.*, issued pursuant to requirements of the Shipping Act, 1916, 46 U.S.C. §§ 801 *et seq.*, 816, 820, 841a.

4. Post trial, plaintiff voluntarily dismissed the complaint as to the defendants AGS Chartering Co., Dravo Leasing Co. and Duck Creek Barge Co. Process was never served on the barges. Therefore, no issue of *in rem* liability was before the Court. *See* Record Doc. # 33.

5. *See* Exhibits D–1 through D–11.

6. *See* Exhibit P–15, Section I—Description and Location of Facility.

7. Preceding trial, the parties entered into the following stipulations: "[A&G] operates a barge fleeting service at Paulina, Louisiana. The Paulina Fleet, as it is commonly referred to, consists of a barge fleeting area and a ship mooring terminal, both of which are located within 4,000 feet of river frontage on the east bank of the Mississippi River between approximately Mile 150.5 and Mile 151.5. Atlantic & Gulf operates a direct transfer facility for bulk grain cargoes at Paulina, within Mile 150.5 and Mile 151.5." Stipulation, Record Doc. # 31, ¶¶ 8 and 9.

tinental) or were for the account of Continental.[8]

As the barges reached the destination point, the master of the Alter tug advised the master of an A&G tug by radio that Alter had in its tows a certain barge or barges for dispatch and requested assistance in taking them from the tows, a maneuver referred to in the Paulina Tariff as "breaking out."[9] A&G's House Counsel and Claims Manager, R. A. Osborn, Jr., who testified for the plaintiff, characterized this communication in its content and extent as the standard notification received at dispatch point. Acting on this request, A&G broke out the laden barges from Alter's tows and placed them in that portion of the Paulina fleeting area designated for loaded barges. Following the eventual cargo discharge and placement of the barges in A&G's fleet for empties, A&G again assisted Alter by "breaking in" the barges to Alter's returning tows. Alter now acknowledges, though originally it disclaimed, responsibility for these tugboat services as elements of its transportation obligations to Quincy and Pillsbury in the amount of $489.60.[10]

Alter, however, persists in its denial of liability for the value of fleeting and shifting services which has been stipulated to be $8,994.80.[11] "Fleeting," according to the Paulina Tariff and as pertinent here, involves the holding of barges at A&G's terminal in its care and custody both before and after their cargoes are discharged. The Paulina Tariff defines "shifting" as the movement of loaded barges by tug from A&G's fleeting area to its floating grain elevator and ship-mooring site for transfer into ocean-going vessels and, following discharge, movement of the empties back into the fleeting area.[12] Mr. Osborn testified

that A&G is made aware of the availability of loaded barges for fleeting, all of which during the period involved in this litigation were destined for discharge at its transfer facility, from one or both of the following two sources: the river tug captains and a list received from a freight forwarder which identifies barges and their cargoes and sets forth the estimated times of arrival of ocean vessels into which the cargoes are to be transferred. Based on this list and various other authoritative information gathered from sources other than Alter, an employee of A&G, referred to by Mr. Osborn as the "Paulina Terminal Superintendent," prepares a schedule of discharges. Although on occasion the superintendent issues a special order varying from the schedule, the A&G tug captain routinely relies on it to determine, first, whether newly-arrived barges should be fleeted or immediately taken to the elevator for unloading, second, when laden barges which are in the fleet should be moved to the elevator, and, third, when the emptied barges should be removed from the transfer site to the fleet for holding to await pick-up by the various barge lines.

The actual transfers of cargoes contained in the barges transported by Alter were performed by A&G pursuant to a preferential-use agreement which was in effect between A&G and Continental[13] at all material times. This agreement, for elevating and stevedoring services at A&G's direct transfer facility, obligated A&G to transfer a specified tonnage of agricultural commodities from river barges to ocean-going vessels. It is evident that A&G established the Paulina Fleet largely to service its transfer facility and to efficiently perform its obligations to Continental under the preferen-

---

8. The bills of lading covering the Pillsbury grain designated Continental as consignee. The Quincy grain was consigned to the order of Quincy and, in the order bills, the words "Account: Continental Grain Company" followed the words "Notify Atlantic & Gulf Stevedores, Inc."

9. *See* Exhibit P–15, Section IV—Schedule of Charges, # 7.

10. *see* Stipulation, Record Doc. # 31, ¶ 16, as revised during trial.

11. *See* Stipulation, Record Doc. # 31, ¶ 18, as revised during trial.

12. *See* Exhibit P–15, Section II—Definitions.

13. *See* Exhibit P–16.

tial-use agreement. Because A&G would be required to pay demurrage if it delayed loading of the vessel,[14] it, of course, wants to achieve a continuous discharge operation from barge to vessel. At trial, Mr. Osborn noted a variety of reasons which could prevent movement of barges, upon arrival, directly to the vessel for unloading. A particular mix of grain may be required. Cargo inspections may not be completed, nor the requisite authority obtained from the Department of Agriculture. The vessel may have been delayed. Traffic jams would be unavoidable. Further, the fleeting facilities would be required if transfer operations were interrupted, again for a variety of reasons. Mr. Osborn conceded that, because of these factors, it would be difficult for A&G to conduct its discharge operations without the Paulina fleeting operation.

We now turn to a consideration of the three theories upon which A&G would predicate responsibility of Alter to pay the disputed fleeting and shifting charges: subjection to the terms of the Paulina Tariff; consent to pay implied from the act of delivery; and quasi contract. Central to all three theories is the requirement that plaintiff demonstrate some benefit which accrued in Alter's favor by the performance of the services.

■ While recognizing that it may not proceed on the basis of a written contract,[15] A&G takes the position that "actual use" of the terminal facilities subjects Alter to payment according to the rates set out in the Paulina Tariff, thereby creating a "kind of implied contract between the parties." Alter does not contest the legislatively binding character of a lawfully promulgated tariff.[16] However, it correctly points out that, in the cases cited by plaintiff to support the policy of strict enforcement of tariffs approved by the Federal Maritime Commission, it was either understood or determined that some benefit could be ascribed to the party sought to be bound. The same cases lend support to Alter's argument that "actual use" of facilities governed by such tariffs is made only by parties who can be said to have benefited therefrom.

■ The second theory advanced by plaintiff is that Alter impliedly expressed its consent to be contractually bound for the services when it delivered the barges to A&G at Mile 151. Plaintiff would stress the "established custom" of most other barge lines similarly situated of paying for fleeting and shifting services at its port terminal. We find that payment or nonpayment by such other carriers is irrelevant to the question at hand. As pointed out in *Bloomgarden v. Coyer*, 479 F.2d 201, 208–209 (U.S.App.D.C.1973), a party seeking payment under an "implied-in-fact" contract must demonstrate that the services were beneficial to the recipient.

As a last alternative, A&G would posit recovery on a quasi-contractual basis. It is clear that the sufficiency of such a claim hinges on the ability of A&G to show that performance of the services conferred a benefit on Alter which, in justice, Alter should not be allowed to retain.[17]

■ In an attempt to establish benefit in the case *sub judice*, plaintiff argues that it relieved Alter of a contractual duty to provide for the disputed services which, plain-

---

14. *See* Exhibit P–16, ¶ 10(a).

15. Paragraphs 1 and 2 of Section III of the Paulina Tariff (Exhibit P–15) set out a procedure for the formation of a written contract for port terminal services which plaintiff asserts is not a mandatory prerequisite to coverage by the tariff.

16. A party who makes use of the facilities or services offered and rendered by another under the terms of a validly promulgated tariff impliedly consents to be bound by the tariff's terms. In essence, the terms of the tariff become the only agreement permitted between the party who supplies the facilities or services and the party who utilizes them. *Folgner v. Italian Line*, 383 F.Supp. 816 (Canal Zone 1974). *Accord, Gilbert Imported Hardwoods, Inc. v. 245 Pkgs. of Guatambu Sq.*, 508 F.2d 1116, 1120–1121 (5 Cir. 1975); *Sommer Corp. v. Panama Canal Co.*, 475 F.2d 292, 297 (5 Cir. 1973); *State of Israel v. Metropolitan Dade County*, 431 F.2d 925, 928 (5 Cir. 1970).

17. *Bloomgarden v. Coyer, supra*, at 211.

tiff claims, is identifiable within the contracts of affreightment between Alter and the shippers. Alter's pertinent obligations under the freight contracts are governed by Waterfreight Bureau Tariff No. 7 (Tariff No. 7),[18] incorporated by reference therein. According to Item 10 of Tariff No. 7, a general provision, the carriage rates exclude cost of "switching" and "any other terminal expense at destination." Item 120(b)—Conditions Under Which Carrier Furnishes Barges—exempts the carrier from liability for costs of holding the barges at a landing designated by consignee once they have been placed in the possession of consignee at destination. "Landing" is defined by Item 1 as "a dock, wharf, mooring place, harbor, quay, *river terminal,* wharfboat or any other location where a barge or barges can be safely held for loading, unloading or other purposes." (Emphasis ours).

These items display, contrary to plaintiff's assertion, an intention of the parties to the freight contracts to immunize the carrier from responsibility for shifting and fleeting services performed at facilities such as A&G's port terminal and direct transfer facilities. The bills of lading obliged Alter to notify A&G. Destination was stipulated therein as "Mile 151, E. Bank, Paulina, Louisiana," the approximate location of the discharge and marine terminal facilities operated by A&G.[19] Upon arrival and following notification, the barges were broken out of the Alter tows by an A&G tug at Alter's expense. The A&G tug captain, working from a discharge schedule prepared by A&G's Paulina terminal superintendent, moved the barges into the fleeting area and made the shifts to and from the elevator at the appropriate times. Continental, the ultimate consignee under all bills of lading, demonstrated its control over the barges when, through A&G and pursuant to the preferential-use agreement between Continental and A&G, it proceeded with the fleeting and shifting operations necessary for the orderly discharge of cargo. During these operations, the barges unquestionably were at their destination, in the possession of the consignee, and placed at a landing designated by consignee and, therefore, Items 10 and 120(b) exempting Alter from all responsibility for fleeting and shifting became operative. The fact that these items, by their own terms, would not come into play in other circumstances, for example, when the fleet at destination was unable to accommodate the barges, does not alter their applicability in the instant case.

We find unpersuasive plaintiff's argument that the destination shown on the bills of lading included only the grain elevator at Mile 151 and that, therefore, the barges were neither at their destination nor at a landing designated by consignee. The simple designation of the destination as "Mile 151, E. Bank, Paulina, Louisiana," neither includes only nor excludes either the terminal or the grain transfer facility. Significantly, Mile 151 is midway between Mile 150.5 and Mile 151.5 within which area A&G's terminal and transfer facility are located. The testimony of Mr. Osborn and other evidence adduced indicate that A&G's terminal facilities were designed in large part as support mechanisms needed to insure the efficient performance of A&G's obligations to Continental. Additionally, we doubt seriously that the shippers would have designated Mile 151 as the destination of cargoes in the absence of fleeting accommodations there. The obvious purpose of requiring defendant to take the barges to that geographic point was to make them available to Continental and A&G for transfer therefrom of their cargoes to ocean vessels when available and when loading of such vessels was in order.

Nor are we swayed by plaintiff's assertion that it should be allowed to bill river carriers for these services because of its purported inability to discern which party, between shipper and consignee, it would otherwise charge, the rationale advanced for the scheme contained in the Paulina

---

**18.** *See* Exhibit D–12.

**19.** *See* n.7.

Tariff. Despite the variance in the nature of the bills of lading, each clearly reveals that the ultimate consignee is to be Continental.[20] Further, plaintiff admits that this scheme is supportable only on the theory that the parties it wishes to charge, the river carriers, must be the recipients of some benefit which accrues in their favor.

We conclude, therefore, that Alter's obligations under its contracts of affreightment with Quincy and Pillsbury were at an end once the barges were delivered to A&G's integrated Paulina facilities. A&G, of course, is not bound by the terms of these contracts. Nor may it engraft on them an artificial reading of the term "destination" which conflicts with what we have found to be the patent intention of the parties, i. e., that A&G would take over when the river carrier had completed its contract of towage and arrived in the area of A&G's river terminal and grain transfer facilities. Plaintiff has been unable to establish, as it asserted, that, because of an obligation arising from the contracts of affreightment to provide for fleeting and shifting services, Alter received a benefit when these services were performed by A&G. All three of plaintiff's proposed theories of recovery, which as previously noted must stand or fall with the benefit postulation, are defeated.[21]

As stipulated by the parties, A&G is entitled to recover for tug services in the amount of $489.60. In all other respects, A&G's complaint shall be dismissed at its costs.

New Orleans, Louisiana

October 19, 1977

---

**20.** *See* n.8.

**21.** *Bunge Corp. v. Federal Barge Lines, Inc.,* 273 So.2d 730 (La.App.1973), *writ denied,* 275 So.2d 868 (La.), *appeal dismissed, cert. denied,* 414 U.S. 805, 94 S.Ct. 67, 38 L.Ed.2d 41, supports this conclusion. In *Bunge,* plaintiff, operator of terminal facilities and owner of grain to be discharged, was denied recovery for "dockage fees" which it alleged had accrued during discharge of cargoes and which it charged against a carrier. The court, finding that the carrier's contractual duties did not encompass any aspect of unloading, including the payment of dockage fees, refused to apply the terms of plaintiff's private tariff to the carrier. Additionally, the court held that no contractual or quasi-contractual basis existed without convincing demonstration of consent by or benefit to the party sought to be bound.