CHEHARDY, Chief Judge.
This case involves a dispute between a stevedoring company and several barge lines over which of them is liable to pay charges for fleeting and shifting of barges prior to and after the unloading of the barges. The suit was instituted by the company that performed the fleeting and shifting of the barges, Convent Marine Companies, Inc.
Convent Marine sought not only a judgment regarding liability for charges accrued as of the date of suit, but also a declaratory judgment fixing liability for future charges. The defendants are Ryan-Walsh Stevedores, Inc. d/b/a Delta Bulk Terminal, Inc., the stevedore (hereinafter called “Delta Bulk”); and Alter Barge Line, Inc., American Barge and Towing, Inc., Conti Carriers, Inc., Robert B. Miller and Associates, Inc., and Riverway Barge Company (hereinafter collectively called “the Barge Lines” or “the Barge Line defendants”).[1]
Following a multi-day trial involving the presentation of reams of evidence, both testimonial and documentary, the district court rendered a decision holding the stevedore and the barge lines jointly liable for the charges arising from the services at issue. All the defendants have appealed.
FACTS
The trial judge set out the facts clearly in his reasons for judgment. We adopt the factual part of his reasons here, with some minor changes in wording:
This action was instituted by Convent Marine Companies, Inc. (Convent Marine), against various parties for certain unpaid fleeting charges. Convent Marine is engaged in the fleeting of barges on the lower Mississippi River near Convent, Louisiana. (In layman’s terms, a fleeting area serves the same purpose for barges as a parking lot serves for cars.) The Convent Marine fleet is in close proximity to a midstream grain-handling facility, the Delta Conveyor, which is owned and operated by Ryan-Walsh Stevedoring Company, Inc. d/b/a Delta Bulk Terminals, Inc. (Delta Bulk). The remaining defendants are all barge lines that trek the Mississippi River with tows of barges.
In the normal course of events, a towboat proceeds from the northerly part of this country down the Mississippi River pushing a “tow,” which is a compilation of barges, some bound for certain destinations and some bound for others. When a boat handling a tow with grain barges destined for the Delta Conveyor arrives in the Convent area, contact is established between the boat and the dispatch center for Delta Bulk and Convent Marine. Convent Marine provides a boat that meets the tow mid-river and assists in excising from the tow those barges to be dropped in Convent.
The Convent Marine boat then transports those barges to the Convent Marine fleet, which is located along the east bank of the river. The fleet consists of a series of buoys located in the Mississippi River near its east bank. These buoys are attached to pilings driven in the bed of the Mississippi and are designed for the mooring of barges. The barges from the tow are tied off to the buoys and the towboat operated by the barge line is free to continue its journey downriver.
Convent Marine continues to harbor or “fleet” the barges until such time as appropriate for each of them to be unloaded. At the direction of the dispatcher for Delta Bulk, Convent Marine delivers the barge to the Delta Conveyor. The Delta Conveyor removes the cargo from the barge moored on one side of it to an ocean-going vessel located on the other. As barges are emptied, at Delta Bulk’s request, Convent Marine removes the barges from alongside the Delta Conveyor and returns them to its fleet.
Thereafter, the barges remain in the Convent Marine fleet until such time as the barge line’s towboat passes by Convent on its way upriver. The barges are then transferred by Convent Marine to a tow of empty barges being handled by the tow *612 boat owned by the barge line. The empty barge is worked into the tow and the towboat proceeds up the river.
The evidence produced at trial established that, from the plaintiffs perspective, there are four movements or “shifts” of the barges. The first occurs when the Convent Marine barge “breaks out” a loaded barge from a tow headed downriver and brings the barge to the Convent Marine fleet. The second shift occurs when the Convent Marine boat delivers the loaded barge from the fleet to the Delta Conveyor. The third shift occurs when the empty barge is taken by the Convent Marine boat from the Delta Conveyor back to the fleet. The fourth shift then occurs when Convent Marine removes the empty barge from its fleet and delivers it to the line-haul towboat headed upriver with the tow of empty barges.
When only these steps are involved, the evidence clearly established that all barge lines, including the ones who are defendants in this action, pay all of the charges. The dispute in the present litigation arises out of the decision by the defendant barge lines to utilize other fleets in the Convent area as their “fleets-of-choice.” Although they are transporting barges that may be destined ultimately for the Delta Conveyor, these barge lines have elected to drop loaded barges not to Convent Marine, which is the closest fleet to the Delta Conveyor, but rather to other fleets up and down the Mississippi River.
As the time nears for unloading these barges, the fleets-of-choice having custody of the barges transport them the short haul to Convent Marine. The Convent Marine boat receives them from the boat belonging to the fleet-of-choice, just as it would receive barges from a line-haul towboat, and the Convent Marine boat deposits the barge in Convent Marine’s fleet. Thereafter, the barge is handled in exactly the same way by Convent Marine as a barge dropped directly from the line haul except that, rather than delivering the empty barge to a line-haul tow headed upriver, Convent Marine delivers the barge to the boat of the fleet-of-choice, which comes to call for it.
Thus, rather than there being four shifts, in the situation here there are a total of eight shifts involved:
(1) The barge is shifted from the line-haul towboat to the fleet-of-choice;
(2) The barge is removed from the fleet-of-choice and delivered to Convent Marine;
(3) Convent Marine receives the barge outside its fleet and then moves it into the fleet;
(4) Convent Marine transfers the loaded barge to the Delta Conveyor;
(5) The unloaded barge is shifted from the Delta Conveyor into the Convent Marine fleet;
(6) The shift from the Convent Marine fleet to the boat being operated by the fleet-of-choice that comes to call at Convent Marine for the barge;
(7) The shift from that point near the Convent Marine fleet back to the fleet-of-choice; and
(8) The shift from the fleet-of-choice to the line-haul tow returning upriver.
ISSUES
As pointed out above, the dispute before us arose out of the defendant Barge Lines’ decisions to begin using other fleeting services as their “fleets-of-choice” when dropping barges for unloading by the Delta Conveyor. Testimony of the Barge Lines’ representatives established they made this decision, each at different times, because of general dissatisfaction with the services provided by Convent Marine when their barges were fleeted there.
There is no dispute either about the amount of the charges or that Convent Marine is entitled to be paid, only about who is obligated for them.
The Barge Lines take the position that they are responsible only for fleeting and shifting services provided by their fleets-of-choice and that all services thereafter provided by Convent Marine are for the benefit of Delta Bulk and thus should be at Delta Bulk’s expense.
*613 Delta Bulk, on the other hand, contends it is the Barge Lines’ obligation to get their barges to the Delta Conveyor for unloading and, therefore, the Barge Lines should be responsible for all charges in connection with the movement or mooring of the barges.
Convent Marine asserts that the defendants are jointly and severally liable for the charges.
LIABILITY FOR SERVICES RENDERED
The trial court determined, correctly, that the applicable law in this matter is general maritime law rather than Louisiana obligations law. As the court stated, “Fleeting and shifting of barges fall somewhere between stevedoring, which pertains to the unloading of cargo, and towage, which pertains to the transportation of cargo.” Both stevedoring and towing contracts are governed by general maritime law. See T Smith & Son, Inc. v. Rigby, 305 F.Supp. 418 (E.D.La.1969) and Intra-coastal Liquid Mud, Inc. v. Choate, 225 So.2d 642 (La.App. 3 Cir.1969). By analogy, therefore, it follows that obligations pertaining to fleeting and shifting also are governed by general maritime law.
Under general maritime law, “[a] party who makes use of the facilities or services offered and rendered by another under the terms of a validly promulgated tariff impliedly consents to be bound by the tariff’s terms. In essence, the terms of the tariff become the only agreement permitted between the party who supplies the facilities or services and the party who utilizes them.” Atlantic & Gulf Stevedores, Inc. v. Alter Co., 617 F.2d 397, 401, n. 16 (5th Cir.1980).
“[A] party seeking payment under an ‘implied-in-fact’ contract must demonstrate that the services were beneficial to the recipient.” Id., at 401; Jarka Corporation v. Pennsylvania R. Co., 42 F.Supp. 371 (D.C.Md.1941).
The main efforts of Delta Bulk, on one hand, and the Barge Lines, on the other, have been directed to proving that only the other party benefited from the use of Convent Marine’s services.
The trial court concluded that the defendants all derived benefit from Convent Marine’s services. This is a factual finding, which we may reverse only if there is manifest error, that is, only if the finding is clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
The Barge Lines contend that Convent Marine’s services directly benefit Delta Bulk by providing a continuous and uninterrupted flow of barges for unloading, “avoiding the unpredictable variables that delay and prolong a barge-to-ship transfer process.” Further, there was a contract between Ryan-Walsh (Delta Bulk’s parent company) and Convent Marine’s predecessor-in-interest, Watson Marine Repair and Cleaning Service, Inc. Under that contract, in return for Watson’s lease of space on the batture in which to moor the Delta Conveyor (an old tanker ship which had been converted to a bulk grain-product transfer facility), Ryan-Walsh granted Watson the right to perform certain boat services and barge fleeting services in operational support of the Delta Conveyor.
Although the contract provided that each was to operate independently of the other, the Barge Lines argue that the contract made Watson/Convent Marine a de facto “staging,” or holding, fleet in support of the Delta Conveyor, permitting it “to have a reserve of barges without a bottleneck at the unloading slip, to put the barges into a specific order for discharge and to avoid a shortage of barges at the unloading slip.”
As the Barge Lines further point out, in ordering barges from the Barge Lines’ fleets-of-choice, Delta Bulk’s barge coordinator expects the line-haul fleet’s tug to deliver the loaded barges to Convent Marine, which will place the barge in its fleet. When the Delta Conveyor is ready for a loaded barge, a Delta Bulk employee calls Convent Marine, which then shifts the barge to the Delta Conveyor. When the barge is emptied, Delta Bulk then calls Convent Marine to remove the empty.
Delta Bulk, on the other hand, contends it has no control over where the barge lines *614 place their barges. Delta Bulk asserts that when it instructs a barge line to shift barges to Convent Marine, it is acting only as an agent of the consignee or the cargo owner and, thus, as the agent for a disclosed principal, whose identity is known to the barge lines. Therefore, Delta Bulk asserts, it cannot be liable for Convent Marine’s charges.
Delta Bulk also argues that, despite the Barge Lines’ insistence that their use of Convent Marine was purely at the direction of either Delta Bulk or the grain consignee, there was no evidence any of the defendant barge lines had ever attempted to bypass Convent Marine by making delivery direct to the Delta Conveyor.
Delta Bulk contends, as the lower court found, that the Barge Lines’ election to fleet their barges at another ‘fleet of choice’ for their own convenience or economies gives rise to an extra move of the barge and extra costs attendant thereto in order to get from the distant fleet to Convent. This election, Delta Bulk argues, is under the control of the Barge Lines, leaving Delta Bulk no say in the matter.
Both Delta Bulk and the Barge Lines state that their tariffs do not include charges for the “secondary” fleeting and shifting expenses involved here and that, in fact, their agreements with their customers disclaim responsibility for such expenses. They contend they cannot, therefore, be liable.
This argument begs the question, however. The issue before us is not liability as between the defendants and their customers, but as between Convent Marine and its customers, the users of its services— which, in this case, are the defendants.
“A party who makes use of the facilities or services offered by another, which are offered or rendered under the terms of a lawfully established tariff, impliedly consents to be bound by the tariff terms. * * * termg 0£ a iawfu]]y promulgated tariff become (in essence) the only agreement permitted between the party who supplies the facilities or services and the party who utilizes them. * * * These rules apply with equal force to tariffs governing terminal operations. * * * ” (Citations omitted.)
Folgner v. Italian Line, 383 F.Supp. 816, 818 (D.C.Z.1974).
Considering the above, we find no manifest error in the district court’s finding that Delta Bulk and the Barge Lines all benefited from use of Convent Marine’s services and that all, therefore, are liable to pay Convent Marine, in their respective proportions.
RES JUDICATA EFFECT OF ARBITRATION
A second issue raised by Delta Bulk was the trial court’s rejection of its exception of res judicata, in which Delta Bulk claimed its liability for the charges at issue here had already been decided by a prior arbitration proceeding between Ryan-Walsh and Watson Marine, in which Ryan-Walsh had been found not liable to pay charges for barge fleeting services provided by Watson to individual carriers.
The district court concluded,
“A review of the arbitration award and the contract clearly establish that the issue in the arbitration was whether or not Delta Bulk (Ryan-Walsh) had any responsibility to indemnify the fleeter for charges incurred by individual carriers. That and that alone was the subject of the arbitration award. The sole issue was whether or not Delta Bulk was secondarily liable for charges of Watson Marine (Convent Marine) billed to others. The arbitration award did not reach the question of whether or not Delta Bulk was primarily liable for those same charges which had been billed to another.
“The prior arbitration proceeding dealt with whether or not Delta Bulk was responsible for the debts of another. It did not deal with the question of whether or not it was Delta Bulk who actually had principal responsibility for the debt at issue. Therefore, the plea of res judicata is to no avail.”
The demand for arbitration was based on a provision of the contract between Ryan-Walsh and Watson that stated:
*615 “[I]n the event responsibility of payment for services rendered by WATSON is disputed between RYAN-WALSH and/or the linehaul carrier and/or any other party involved, RYAN-WALSH shall pay WATSON * * * and it shall be the sole responsibility of RYAN-WALSH to resolve the dispute with reference to the party ultimately responsible for the payment for services rendered by WATSON and RYAN-WALSH shall be reimbursed by the party ultimately responsible. * * * ” (Emphasis added.)
The subject of the arbitration was the question of responsibility for “indemnification” of Watson by Ryan-Walsh for “fleeting services in operational support of the Bulk Facility provided loaded barges,” pursuant to the indemnity provision of the contract, which stated:
“[Ejach party does hereby, reciprocally, release the other from and assumes responsibility for and agrees to indemnify, protect and save harmless the other, from any and all actions, claims, judgments, liabilities or demands by reason of loss, injury (including death), or damage to any person or property arising out of or relating to the negligent action or omission of either party hereto. * * * ”
See Appendix A to this opinion, the arbitration submission letter of Watson Marine Services, Inc., dated April 29, 1983, and Appendix B, Award of Arbitrators, signed December 22, 23, and 28,1983 by the three-member panel of arbitrators.
Watson contended this provision required Ryan-Walsh to “indemnify” Watson for disputed fleeting services. The arbitrators, however, concluded Ryan-Walsh was not responsible to indemnify Watson for charges for barge fleeting services provided by Watson to individual carriers.
What was at issue was whether Ryan-Walsh had any responsibility to indemnify the fleeter for charges which were the responsibility of the individual carriers — that is, whether Ryan-Walsh was secondarily liable for charges of Convent Marine that had been billed to others. As Convent Marine points out, the arbitration award did not reach the question of whether or not Delta Bulk was the party primarily liable for those charges that had been billed to another. Although Delta Bulk insists this distinction is erroneous, we agree with the trial court’s conclusion.
For a plea of res. judicata to succeed, “[tjhe thing demanded must be the same; the demand must be founded on the same cause of action; the demand must be between the same parties, and formed by them against each other in the same quality.” LSA-R.S. 13:4231 (formerly LSA-C.C. art. 2285). See Lamana v. Leblanc, 526 So.2d 1107 (La.1988).
The doctrine of res judicata is stricti juris and any doubt as to the identity of the claims must be resolved in favor of the party against whom the plea is made. Dart v. Ehret, 466 So.2d 1336 (La.App. 5 Cir.1985), writ denied, 468 So.2d 575 (La.).
Considering the above, we find no error in the trial court’s rejection of Delta Bulk’s exception of res judicata.
APPLICABILITY OF ATLANTIC & GULF STEVEDORES CASE
Finally, we must discuss the Barge Lines’ reliance on the case of Atlantic & Gulf Stevedores, Inc. v. Alter Co., supra. That case involved a dispute between a stevedore and a barge line over shifting and fleeting services provided by the stevedore’s own fleeting facility, which was integrated with the transfer facility. In that case the federal circuit court concluded the barge line had fulfilled its contractual duty to its consignees by delivering the barge with its cargo to the fleeting facility, because the fleeting facility and the grain transfer facility were one.
Although the Barge Lines vigorously argue that Atlantic & Gulf Stevedores governs this case, as pointed out by Delta Bulk, numerous differences exist that make the case distinguishable on its facts. We have adopted the following table from Delta Bulk’s reply brief, demonstrating the differences between the case at bar and the Atlantic & Gulf Stevedores case:
*616 TABLE COMPARING THIS CASE WITH ATLANTIC & GULF STEVEDORES, 617 F.2D 397 (5TH CIR.1980)
Convent Marine and Delta Bulk
1.Convent Marine is an independent fleet. Delta Bulk is a separate stevedore.
2. Neither Convent Marine nor Delta Bulk assumed or were obliged to accept delivery of cargo on behalf of the cargo owner or consignee.
3. Delivery to the Convent Marine fleet was not delivery to the consignee.
4. Bills of lading specified delivery in Convent but to the order of the the consignee “c/o Delta Bulk” and not the Convent Marine fleet.
5. Cargo owner required a continuous and uninterrupted supply of barges; Delta Bulk was not obliged to supply this flow and Delta Bulk was not responsible for any delays resulting from any interruption in the supply of barges.
6. Delta Bulk contracted with Convent Marine to require Convent Marine to provide certain services in operational support of Delta Bulk’s operations.
7. The barge line defendants had a contractual obligation to shift the barges to the location designated by the consignees at the Delta Bulk midstream transfer rig, an obligation even acknowledged by the barge line defendants if they elected to drop their line-haul tows at the Convent Marine fleet, as they did on occasion.
8. If the defendant barge lines elected to stop their line-haul tows at a fleet other than Convent Marine and if additional fleeting and shifting charges were incurred, provisions were made by the Barge Lines to have their shipper or their consignees pay for these extra shifts and fleeting costs.
Atlantic & Gulf Stevedores
A & G operated as a “completely integrated” facility, performing as both the fleet and as the terminal employing the stevedore. 1.
2. A & G specifically undertook the responsibility to act on behalf of the cargo owner and consignee (Continental Grain) in the acceptance of cargo.
3. By agreement with the consignee, delivery to A & G was delivery to the consignee (Continental Grain).
4. Bills of lading specified delivery to “mile 151.E.Bank Paulina, Louisiana,” which was the location of the A & G fleet.
5. A & G required a continuous and uninterrupted supply of barges because A & G would itself be responsible for any delays resulting from an interruption in the supply of barges.
6. A & G established the fleet so that it could “officially perform its obligations” to the cargo owner and consignee by providing continuous supply of barges.
7. The defendant barge line had an obligation to deliver the barge to the A & G fleet.
8.In light of the barge line’s acknowledged obligation to deliver to the fleet, the barge line paid a “tug service” fee for the A & G fleet boat to take the barge from the barge line’s tug and put it in the A & G fleet (“one shift”) and another fee to replace the empty barge into the barge line’s tow (“another shift”), so that any further fleeting or shifting was for the account of A & G and/or Continental under A & G’s rate structure.
*617 Convent Marine and Delta Bulk
9.The Barge Lines entered into separate transportation agreements, most providing for the payment by the barge lines of fleeting and shifting before delivery to the midstream rig.
10. The cargo owner or Delta Bulk (acting as agent for the disclosed cargo owner), would request the Barge Lines to move their barges from their distant fleets to Convent.
11. Delta Bulk orders the Convent Marine fleet tug to remove the empty barge from the Delta Conveyor and return it to the Convent Marine fleet.
12. The barge line defendants notified Delta Bulk and Convent Marine that they would not pay the charges, but they or their agents continually brought barges to Convent with the express understanding that they would be placed in an independent fleet, which they knew was assessing charges for their services.
Atlantic & Gulf Stevedores
9.The barge line transportation agreements were governed by Waterways Freight Bureau Tariff No. 7, which was later revoked; now the industry is unregulated.
10.A&G ordered barges to its fleet.
11. A&G ordered the Paulina fleet tug to remove the empty barge from the transfer facility and return it to the Paulina fleet.
12. The defendant barge line notified A&G that it would not pay the A&G charges.
MOTION TO DISMISS SECOND APPEAL
The final issue is a motion by Convent Marine to dismiss a second appeal lodged in this matter. The second appeal arose from a petition for supplemental relief filed by Convent Marine approximately two months after the judgment rendered on the original petition.
In the petition for supplemental relief, Convent Marine sought recovery for fleeting and shifting charges accrued since the judgment on the original petition. Judgment was rendered granting relief as prayed and the barge lines and Delta Bulk both appealed. This appeal we shall refer to as the second appeal. The supplemental record containing the pleadings and transcript thereto was filed, under the same docket number as the first appeal, approximately two weeks before oral argument on the first appeal.
Convent Marine, as appellee, moved to dismiss the second appeal, on the ground the defendants-appellants acquiesced in open court to the terms of the judgments rendered against them. Convent Marine also contends that the first appeal, with respect to the portion of the first judgment that was a declaratory judgment as to Convent Marine’s future charges, is devolutive and, therefore, the plaintiff-appellee is free to enforce those declaratory judgments by any lawful means.
Considering our conclusion on the merits of the first appeal, we dismiss the second appeal for mootness, as it is governed by the effect of the declaratory judgment, which is upheld by our decision herein.
DECREE
Accordingly, we find no manifest error in the district court’s factual findings or in its application of the law. For the foregoing reasons, the judgment of March 23,1989, is affirmed. The appeals of the judgment of August 23, 1989, are dismissed.
Costs of this appeal are assessed in the manner set forth in the district court’s sup *618 plemental reasons for judgment — one-half against Delta Bulk Terminal, Inc. and one-twelfth against each of the Barge Line defendants-appellants.
JUDGMENT OF MARCH 23, 1989 AFFIRMED; APPEALS OF JUDGMENT OF AUGUST 23, 1989, DISMISSED.
APPENDIX A
[[Image here]]
*619 [[Image here]]
*620 [[Image here]]
*621 [[Image here]]
*622 [[Image here]]

. Several other barge lines that were defendants in the suit settled with the plaintiff prior to trial and were dismissed; hence, they are not included on this appeal.